May it please the court. My name is Venkat Balasubramani on behalf of Seattle Mideast Awareness Campaign. This case raises the question of whether King County can subject the boundaries of its bus advertising forum to a heckler's veto. The First Amendment requires this question to be answered in the negative. CMAQ is a nonprofit organization dedicated to raising awareness about Israel-Palestine relations. The text of CMAQ's ad read, Israeli war crimes, your tax dollars at work. There's no dispute that King County reviewed CMAQ's ad at the highest levels and concluded that the ad complied with King County's policy. We're familiar with the facts. Let me jump right to the issues. The policy I understand has been changed. At least that's what I understand from the record is that they no longer accept advocacy ads. Does that move the case in any way? It doesn't, Your Honor. CMAQ brought a claim for damages, for compensatory damages and nominal damages, and that claim is still live. So it's live as to damages? Absolutely. How about as to equitable relief? With respect to injunctive relief, CMAQ's position is that the district court should address this issue in the first instance with the benefit of a more fully developed record. The record contains or has reference to CMAQ's interim policy, which I believe restricts the forum to commercial advertising, and I don't believe the record reflects exactly the current state of CMAQ's policy. In any event, the district court didn't address the injunctive relief issue and should address that in the first instance. But can I just be clear on this? I thought that the record is that they're in the process of changing their policy, but we don't yet know on this record anyway what their final policy is going to be, revised policy is going to be. If I'm mistaken, I'd really want you to correct me. I believe there's a reference to an interim policy that said that only commercial speech or advocacy speech would be excluded, but the final policy I don't believe is in the record, and I can confirm that for you. The fundamental problem with King County's policy in this case, or at least the prior policy, is twofold. First, listener reaction is not a viewpoint neutral basis for expressing speech, particularly when that reaction opposes the message in question. Let me just ask you this, because I understand what you're saying about allowing a heckler's veto to censor speech that does seem rather viewpoint discriminatory, but I guess the problem I have is imagining if the ads had been allowed to run and some, let's just say some attack on a bus had occurred, right, so that we are talking about hostile audience reaction to the speech, but if an actual disruption to the county's transportation system had occurred and they had pulled the ads at that point, would you agree that that would have been permissible under the First Amendment? No, Your Honor. A threat of disruption from a hostile audience, and I think Norse and white both stand for this proposition, that's not tied to the manner of expressing the message is not a permissible basis to exclude speech. So, just so I understand, the county just has to keep running these buses, they're just easy targets, and they get attacked left and right. You're saying the county is completely powerless at that point, other than just getting sued by you for damages, to pull the ads? Well, the county is not powerless. What the county can do is arrest the people that are throwing rocks, and I think that's the appropriate reaction. Well, let's change the facts just a tiny bit. Let's say they can't get drivers to do it because drivers are afraid the bus could get attacked, and so they have to pay double overtime for the few drivers that are willing to. Let's say that's the facts, and the county says, look, we can't make people drive buses when they tell us they're afraid. And they decide, look, this is not worth it. We're not making enough money on the ads to justify paying double time for, you know, we have to get overtime drivers. And they just say, it's not worth it. Still not a viewpoint-neutral basis. And I think airline pilots in the Chicago Acorn case delve into this issue, which is that to the extent you tie audience reaction to revenue, that's just an easy way for King County to affect viewpoint discrimination. It's really just a variation of the argument that we can't. But let's say, in fact, there's no subterfuge at all. In fact, drivers read these things, and they say, look, we are not willing to drive the bus. We think we're going to be in danger. We've got families. We're just not willing to do it. And they've got to, they said, you know, we don't care about the viewpoint, but we do care about having to pay extra for our bus drivers because we don't make a lot of money, you know, on the ads. And this is a loss for us. It's just a business decision. Why isn't that a legitimate basis? It's still not viewpoint-neutral. I think it's no different from forcing a demonstrator to bear the cost of whether that's security or insurance. Whether that comes in through driver concerns or through the government saying, we have this fear of disruption, ultimately, it's tied to audience reaction from people who oppose the message. And we would contend that that's still not a viewpoint-neutral basis. So if drivers refuse to drive buses out of fear that people are going to throw rocks at buses, that would still not form a sufficient basis for King County to pull the ads. I think it's also... There were photos slipped under the door that showed a bombed-out bus with mangled bodies. So I think I'd like to go back, if I can get you to take another run at Judge Watford's question. How far do they have to go? There were these threats and there's a, let's say there's a real concern. They don't know what the reaction is going to be. But apparently anything from throwing rocks, offending people, throwing rocks, maybe a passenger is going to get on the bus with a bomb. With other, of course, innocent members of the public. How far do they have to go? Do they have to wait for violence? Or where would you draw the line? I would say that the threat of violence from somebody who opposes the message, whether that's in the form of people throwing rocks or defacing ads, or some sort of a larger scale threat, is not a sufficient basis for excluding the ads. And with respect to, I know this isn't Your Honor's question, but with respect to the photographs, the record reflects at least that King County was concerned with a small scale threat. It expressly disclaimed the issue of terrorism in its motion for summary judgment, and this is at ER 97. There was this undercurrent of a link to the story posted on the Arkansas Brigade website, but their own actions, King County's own actions show that they did not view this as some sort of large scale threat. Counsel, can, I'm sorry to jump, I'd like to, let's get to the facts of this case in a minute, but I'm still not satisfied with where we left things on my hypothetical, because I don't, I don't think I agree with you that if I set the standard, if I'm the county and I set the standard as, it's not, it doesn't matter about the viewpoint. I don't care which side of the debate is causing a disruption to my transportation system. If that's the standard I set, that's viewpoint neutral. And if in my hypothetical, there is an actual disruption, buses are getting blown up, you're saying I can't pull the ads at that point? That strikes me as completely viewpoint neutral, and I haven't been persuaded by your argument to the contrary. Well, I think the threat of violence, it's, it's, it doesn't allow for a reviewing court to, to adequately scrutinize King County's justifications, and I think that... In my hypothetical, buses are being blown up, right, in reaction to the message. And, and the county is taking the position, we don't care if the ads have been run from the other side. If our buses are getting blown up, we're not running the ad. It's actually disrupting our system. And you're saying that that's viewpoint discriminatory. I just, tell me, help me with that. Well, it's, it's basically giving effect to people who object to the message. And, and they object to the viewpoint, and they're saying we're going to blow up the buses. And King County is essentially giving effect to that objection. Right. And that's, that's... And they wouldn't give an effect to the objection if the, if ads from the other viewpoint had been run, and the same disruption had occurred. So how is that viewpoint discriminatory? Well, I think they say that, but, you know, that's the problem with giving effect to... The only, the only evidence I see in this record that they, that this is just a mere pretext for viewpoint discrimination, right, is that they wouldn't run the counter ads. And that seems to me, if anything, to prove that this truly was viewpoint neutral. The counter ads, if anything, point to viewpoint discrimination. Because disallowing CMAQ from running its message out of fear that opposing groups would express their views, Arizona Life says that's viewpoint discrimination. And I think there's also a factual dispute in the record about whether the concern was really over the threat of disruption, or did they want to not offend people? And Executive Constantine himself said, as part of his rationale for not running these ads, his intent was to not offend people on both sides of the debate. I think we can agree that's, that's viewpoint discrimination. Well, there were other ads they turned down on the same basis. They turned down, I mean, they have a whole blanket prohibition on smoking ads and sex shop ads. And then there was a, wasn't it an abortion ad that was rejected? I don't believe the ad, an abortion ad was rejected, Your Honor. There was one ad that was rejected that was, and I can pull this in the record under the civility clauses, but it was actually withdrawn before it was rejected. But with respect to Your Honor's question, they're allowed to make content-based distinctions. They can take categories of content off the table, and they're, so long as it's reasonably related to the purposes of the forum. So, if they want to take political speech off the table, there's nothing wrong with that. But if they let in political speech, along with political speech comes, courts have recognized, the clashes of opinions and controversy. And that's exactly what happened in this case. So, your view is that if they allow political speech, they would have to allow an ad that says, Mr. Smith, my opponent for the Senate, is a child molester. Well, You know, I, you know, they would have to let that run because they allow political speech. And why couldn't the bus company says, look, it's just not in our, that's level of discourse is not something we want on our buses. They might have another basis to exclude the ad that Your Honor suggested. Maybe that references to sex or sex related themes can be taken off the table, and that would sweep under that prohibition. But, Case bribes. That would be allowed, I would believe. I mean, it might be defamatory and excluded on the basis that it's defamatory, but there's actually a New Giuliani objected to running ads, and I believe it was a federal district court said, you got to run these ads. They beat up on Mayor Giuliani, but you take political speech, you don't have an objective basis to exclude the ads, you have to run the ads. So, to the extent it can't be excluded under some sort of broad content based category, they would have to take the ads. I think it was Mayor Bloomberg, but could I ask you a question about that, please? And because it seems to me that there's a really long history for this program, 25 years or so, but what we're looking at is just the language in the contract with Titan, the current administrator that only goes back five years or so. So, my question is whether or not the policy, Metro's policy, has been the same throughout the whole time they've had this program in place. I believe that there was a slight changes to the policy. I don't have handy exactly what the testimony in the record from Sharon Shinbo and Linda Teoki that say that for 20 years, King County has accepted a broad range of advertising, and in the messages they sent in response to objections to the Save Gaza ad and CMAX ad, they said, we have to accept these ads because we've accepted ads from other political groups, and our hands are tied. So, I don't know if this policy, this provision was in the old policy and how similar it is to the old policy, but I believe the record is clear, at least, that there was a long history of accepting political advertising. So, when we look at what kind of forum may or may not have been created, we're looking at intent, whether there was an intent to create a designated public forum, it seems to me, and that's why this long 25-year history might be really important if there was only one ad rejected during the whole time and that was really pulled by the sponsor, as opposed to, we're looking at Titan's period of time, because I think that's only, you can help me, five or six years, something like that, a much shorter period of time. That's why it seems to me to be a crucial fact that I can't find clarification in the record. Well, I believe King County, at least statements from King County itself, reflected a policy that they understood for any number of years, and I think the Sharon Shinbo Declaration gets into this about how long they've accepted political ads and the various types of ads they've accepted. So, intent is one element, but their policy and practice, in practice, I think, is reflected in the declarations of Sharon Shinbo and in their responses to the public opposition to the Save Gaza ad and to CMAX ad. Well, you know, I found the ad I was talking about, it wasn't abortion, it was death with dignity, some ER 148. They rejected that ad. I believe I'll have to... You know the ad I'm talking about? I'll have to double check. I'll have to double check that one. I'm not aware. It's right there. I didn't recognize this as the death with... Is it ER 148? That's the one. This ad they said they were going to reject, and I believe the testimony is that it was pulled before they could reject the ad. Well, they rejected it. I mean, you know, they said they rejected it and they pulled it. So they have rejected things in the past that are political, that have political implications, but that they thought were in bad taste. So it's not like they... This has nothing to do with the controversy that your client is involved in. This is the one ad they've rejected, and they've previously accepted ads on atheism that I believe raised the hackles of bus drivers, and drivers even protested against those ads by defacing them, engaging in work stoppages. There was also an ad about Rush Limbaugh. There were ads about the Iraq War. There were ads about animal cruelty. There was a broad range of topics that were in the vein of CMAQ's ad. And I don't think a standard of decorum, I think, is a fundamentally unworkable standard. It just comes down to the subjective views of King County's administrators as to what they think is offensive or not offensive. So I don't know that the rejection of this ad in any way undermines CMAQ's argument. I think it may speak to the public forum issue, and the fact that they had a long history of accepting political ads undermines the fact that they rejected one ad or tried to reject one ad out of the many hundred ads that they accepted. But... But they didn't reject this ad because they found it offensive. They initially approved the ad. The CMAQ ad? They rejected it because they got feedback in a big way, 6,000 emails, and these photos slipped under the door, right? That's correct. It was originally approved. Right. And to me, that just illustrates that there's nothing on the face of the ad, even assuming they could have some sort of standard that was too inflammatory or offended anybody's sense of decorum. King County, multiple levels, Executive Constantine himself reviewed the ad and found that the ad comported with the policy. So that just illustrates to me that the sole basis for rejecting... That's one of those facts that probably hurts you more than helps you. You may think it's helpful, but actually it hurts my ears. I said, look, we don't have any problem with it. But, whoa, and we start getting all this pushback and we start having bus drivers saying they're not going to drive the buses. We start having legitimate fears that our equipment will be put in danger, that our people will be put in danger. At that point, we don't care about the message. The message is fine, but we care about the reaction. We're running a bus system. We're not... This is a little bit of side business for us to make some money with. It's not something that we can allow to interfere with the operation of the transit system. To me it shows that everyone felt that the ad complied with the standards. It fell within the policy. It addressed a topic that other ads addressed, the Save Gaza ad and the Remember Israel Soldiers and Victims of Terror. So all it comes down to is people objected to the ad, and it points to the fact that public objection was the sole reason for pulling the ad. That's fundamentally an improper basis for pulling the ad. I guess, can I just ask you this? I really puzzled over this the whole time I was reading your briefs. If your position really is that once a county opens up a forum to any kind of political speech, that no matter how disruptive to the actual operation of the system, it doesn't matter. You can never pull the ads. Obviously all they're going to do is what the county did here, ostensibly shut the whole forum down to political speech. How is that protective of First Amendment interests? It seems to me to be completely counterproductive from your standpoint. I would agree with that, Your Honor, that some transit agencies may take the route of limiting the forum to political speech. Other transit agencies may stand up and say, we're willing to have political ads and we're going to try to draw lines, and I agree that it's a challenge. I think that's a tough question. I don't have a good answer for that. I hope transit agencies would say that we're going to try to be objective, allow for discourse in our advertising forums, and do so in a viewpoint-neutral way. I'd like to reserve the remainder of my time, if I may. Okay, thank you. We'll hear from the opposing counsel. May it please the Court, Endell Cold for King County. In First Amendment analysis, like archaeology, context is everything. It's not just the speech that matters, but where you find it. It also matters what else and who else is there. This case is about whether local government can establish reasonable ground rules for an advertising forum it created on its buses. Metro's advertising program was created to support public transit. Let's say they have a parade in a park or a rally, and all of a sudden the city learns, you know, this is going to attract a lot of people. This is a very controversial rally or a very controversial parade, and people are going to come from all over. You're from Seattle, right? It's happened. And we're going to have to spend a lot of money on police. We're going to have to probably have lots of shattered glass and businesses disrupted. So we're just not going to do this. We allow parades for everything else, and we don't have any problem with the message, but this is just too hot for us. Would that be a good reason to deny a parade permit or a rally permit in Seattle, at one of the parks? I think what's important, Your Honor, is the nature of the forum, whether we're talking about a limited public forum like we have on buses. That's why I changed it. I said either a parade or a park, a place where traditionally it's a place where you have rallies, where you traditionally have parades, you know, a street, a park. And they say, yes, we do, and we have no problem with any viewpoint at all, but suddenly we found out that people are going to be flying and busing in from the entire country and descending on us to object to this expression, political expression. Can the city say, look, it's just too expensive? You know, fine, we like different points of view as much as anybody, but we're just not going to have our police put in danger, and we're not going to have our businesses disrupted, and we're not going to have blood in our streets and all the bad publicity that comes from it. It's happened once before, and we're just not doing it again. Can Seattle do that? As a general proposition, no, because it's a traditional public forum, and so the city is held to a much higher standard, particularly, you know, with respect to stopping conduct before it's going to happen. There will be potential prior restraint issues, and we would have to look at, are we talking about time, place, manner restrictions? But no, a traditional public forum like a sidewalk or a park is different than a limited public forum like buses. What about a designated public forum? If our position here is that the buses are not a designated public forum, and I think if the evidence were otherwise, that the county had intended to open up its bus ads, its bus ad forum as a sort of a roving speaker's corner where anything goes, I think it would be a tougher case for the county. I think we still have a compelling government interest here in ensuring the smooth operation of the public transit system, but our case is very different. You've talked now for pretty much a minute, but I still haven't heard an answer to Judge Kristen's questions. Judge Kristen's question. I apologize. The question is, what about a designated public forum? I don't want to hear about why this isn't or what could be there. Just answer the question. What about if it is a designated public forum? We can talk later whether it is or not, but just get yourself in the mindset that we're now talking about a designated public forum. So what is the answer there? I think in a designated public forum, it would be a tougher case for the municipality to A tougher case is a weasel answer. It doesn't help us at all. The question is, how do we come out? This is your chance to tell us. If you don't want to tell us, that's okay. We'll go back there and decide the case without your help. So what is your position? Our position is it would still be a compelling government interest in that case in attempting to protect bus riders and the public. So a traditional public forum is different from a designated public forum in that regard? I haven't thought about that issue, Your Honor. Well, you should have. You should have been moot courted. But I'll just take a minute and think about it. In this case, I would argue yes. Not in this case. Not in this case. In the general case. In the general case of the, you've given us an answer in the traditional public forum, and just christened said, what about a designated public forum? And are you now arguing that the two are different and different rules apply? It's a creative answer. I would argue that, yes, if the designated public forum is at a space on the sides of buses. And what case do you rely on that treats those two classes of fora differently? I don't have a case. I think it makes sense in terms of the incentives. Could it be Seattle Middish Awareness Network versus King County? He's hoping. Well, our position is certainly I hope not. But that answer makes no sense, does it? Because I thought what happens when you designate a public forum is you're taking a space or area that is not a traditional public forum like a street or a park or the usual places where you have public fora, and you're creating it. You're essentially artificially turning it into a public forum. It's still a public forum, but it's one that's created rather than that arose organically. And I can't see how they could be treated differently. Well, I think I'd have to think about this a little more, Your Honor, but I think there's some room for the government to redesignate that forum if it created it in the first place. The government doesn't have that ability when it comes to a traditional public forum. You think it can be designated after they get the ad? Is that your position? Well, there's certainly evidence in some cases that they can redesignate public fora going forward. They may have to take a hit, you know, for what happened at the time. But our position is in this case there's no evidence. But we don't have that case. That would be the next case. Assuming you change the policy and we don't know, I think your answer is no different. As far as the record is concerned, we don't know what the final policy is. But assuming they've changed the policy and now they come back and say, we still want to buy an ad, and you say, oh, we've changed the policy, that would be the next case and we'll deal with it then. But this case doesn't involve a change of policy, right? This involves a rejection under the old policy. This case involves a rejection under the old policy, and our position is that the evidence from the undisputed facts is that it was a limited public forum. There was no clear intent to open this up to unlimited discourse. As the Court has pointed out in the questioning to my esteemed colleague, there were a group of five prior ads that had been rejected under the policy at issue in this case that had been in place for approximately five years. And that shows that the county was actively policing access to its forum and not viewing it as a forum where anything goes, anybody can speak, regardless of the impact it's going to have on others. Well, but Sharon Schimbo said that this, I think she's the person who's been running the program or involved in it for some 25 years, I think. Since 1985. Right. So why wouldn't this be a designated public forum? The Metro is certainly inviting and, in fact, charging folks to put their ads on the side of these buses, albeit maybe a billboard that moves with wheels. But why isn't that a billboard, nevertheless? It's a limited public forum. I mean, in that sense, a limited. But my question is, why isn't it designated, counsel? Because we've said in the Hopper case that a subjective, mushy policy is no policy at all. I think we probably said it a little differently than that. Right. Well, we don't have a subjective, mushy policy here. Well, it's whatever offends people. What is that? It's not a whatever offends people policy. I mean, there's certainly evidence that some ads that might be viewed as controversial and that invited some public comment and negative feedback were run in the past. So that's not been the county's policy. But it's a little subtler than that. I mean, this is not like a fetus ad. The county might say, look, this is just people looking at, you know, it's not the message. It's the way it's presented. As best I understand these ads, what was offensive about these ads to some people was the message, not the way it was presented. It wasn't that you looked at the picture or the words or anything else that, you know. It was the idea. And isn't that sort of the core of the First Amendment? That when people are offended by the content of a speech, when people object to the content, to the meaning, to the message, that that is sort of strikes at the core. And you stop speech on that basis. That strikes at the core of the First Amendment. Your Honor, it's the context that matters. And the CMAX ad violated the civility provisions because it targeted. I'm sorry. What is CMAX? CMAX is, I'm sorry, that's the short form of Seattle Mid-East Awareness Campaign. Oh, these guys. Sorry. Yes. C being Seattle. I thought you said Max. Yes. CMAX. Who is Max? Not the new Ford car, no. So it violated the civility provisions because it targeted and labeled a group in a manner calculated to be offensive and incendiary. It accused Israel of committing war crimes, and this accusation has to be understood in its historical context. The original war crime, as we understand that term today, was the Holocaust. Israel was founded in part as a response to that. Oh, there were war crimes long before the Holocaust. Certainly. But the Nuremberg trials, in many ways the concept, judicially recognized concept of a war crime, grew out of that experience. And so using this type of terminology with respect to Israel or Israelis was calculated to provoke a strong response. Counsel, if I view it that way, then I really start thinking heckler's veto. Why shouldn't that trigger heckler's veto if the problem is that people are going to be angry by that speech? Why isn't that absolutely the First Amendment? The real heckler's veto here, Your Honor, is the CMAX veto of the right of bus riders in King County and bus drivers who work for King County to go about their business without being drawn to this debate that they don't want to have any part of. A whole lot of transit authorities, the case law tells us a whole lot of transit authorities have this type of policy, understandably, to garner revenue, this type of program, and they'll have an objective rule. No noncommercial speech. Gap jeans can be advertised. That's just fine. But no political speech, no cause messages. That's not the policy that was adopted by Metro. It's certainly true that under the Phoenix case, the Children of the Rosary case, some municipalities have decided to make those bright-line categories, and it's clear that that's permissible. King County here made a reasonable judgment to try to maximize its income from the ads by allowing some political ads. The evidence is it's a very small percentage. And, in fact, the vast majority of them have not been offensive to people or garnered this kind of reaction. We know from the Ridley case that in that case the First Circuit said it's okay to have reasonable ground rules as long as those ground rules are applied equally and aren't meant to single out or favor one viewpoint over another. We're saying let's take it. What are the ground rules here? The ground rules here are it should not be a message where it would be reasonably foreseeable that it would incite or provoke retaliation against the transit system, potential disruption against the transit system or retaliation. So let's say somebody wanted to buy a campaign ad opposing the president, not necessarily supporting his opponent, but just a third-party ad opposing the president. And the transit authority said, well, this bus goes to a neighborhood that is very strongly supportive of the president. So we're just not going to – we don't want any trouble. We're not going to allow that ad. Is that okay? Can you do that? I think you'd have to – we'd have to have some more facts to understand. No, I'm sorry. That's all the facts you get. Certainly. That's all the facts you get. And I realize I don't get to make the hypotheticals. Yeah, you know, work with the facts. I mean, there's an answer, yes or no. If you need more facts to provide a no answer, then the answer is yes. In general, no, but what matters is the context, and the context here – Why not? So, you know, we go to this neighborhood. We know the demographics of our city. It's a very heavily – it's a city that – it's a neighborhood that's very heavily of the party of the president. And I'm not necessarily speaking of this president. I'm talking about the president. And we know that people are going to get very angry about these ads. They don't say anything good about his opponent. What they say is what a terrible job he's done for the last four years, and just lists all of the criticisms. And people are just going to get upset about this. We don't want it. We are lucky in the United States, at least within the recent history, that we don't have a tradition of political violence like that. And I think that's unfortunately different in the Middle East. And that is part of what matters in this decision. But what are the Middle East? We're in the 9th Circuit. And if the buses were going through the Middle East, maybe we'd have a different problem. I think these are local buses, right? Again, the context matters. We want government to be responsive and to look at the facts in a given situation. This was a hot-button issue. It's one people feel very strongly about. And counter ads were proposed. If you accept plaintiff's premise that this is a designated public forum, then everyone gets full First Amendment access. It means the counter ads run. Those draw connections between Hitler and Palestinians and show blown-up buses. Just because there's strict scrutiny doesn't necessarily mean that. Then we might be talking about some time, place, manner restrictions and whatnot. But if we take this one step at a time, and I'm still trying to figure out why that invitation, you used the word invitation for some political speech, why doesn't that make this a designated public forum? Because all political speech has still been subject to the filter of the civility provisions. And all we have here is a long tradition of people not submitting ads that are incendiary, that provoke this kind of response. We have a few. We have that batch of five, which I could term loosely the Nazi doctors' ads. They're in the record. And those were appropriately denied by the county in 2009. There are other very controversial ads likely to provoke anger, including about this Mideast conflict that Metro ran. They ran. There were some complaints. They were comparatively very few. Not a single one of those complaints threatened retaliation against Metro. And that's what's important here. Our position, Your Honor, is that to show viewpoint discrimination, the plaintiff needs to show that the county did not cancel or deny a comparable ad where you had comparable threats of retaliation or retribution against Metro. There is none. The Santa Claus ad, people were upset. Not one person threatened retaliation against Metro. Let's do a rule in your favor. Let's say we do. Why wouldn't this be an invitation throughout the Ninth Circuit, and perhaps it's picked up by other circuits in other places, that if there are ads or rallies or demonstrations or parades with political messages, you should use the power of the Internet, Facebook, tweeting. Texting. Texting. That's good. He gets it. You know what I'm talking about. Use that to rally people who at least threatened to come and disrupt, and maybe even actually come and disrupt. We're living in a different world than we did 10 or 15 years ago or 20 years ago, where you actually can mobilize large groups of people to at least write and sometimes to physically look at the Occupy Wall Street and so on. So you can actually move fairly large groups of people to come and do fairly disruptive things at long distances. Why wouldn't this be an invitation that any time you sort of object to a message, a political message, we'll use these techniques to threaten the facility that carries the messages, and thereby we've looked at the Ninth Circuit opinion in the CMAX case, and they say it's okay. At that point you can pull it. Why isn't that an invitation for that? Why isn't that pretty much the end of the First Amendment? I would really hate to have it die right here in the Ninth Circuit. You know, it's a point that Professor Volokh has made too, and I think it's an interesting— He's a brilliant guy, you know. He had a great clerkship. It's an interesting thought problem, but I think we haven't seen it before, and we haven't seen it since. We've seen it now. It's here. It's today. Well, it's unusual, and, again, that's why we're pointing at the context. But I think Your Honor's hypothetical points out why we don't need to be so worried about it, because of the Internet. That's what makes it easy. That's what makes the heckler's veto on steroids so easy. That's the Chief's point, right, to really quickly mobilize a negative public response. Anytime you want to shut down speech. But we haven't shut down the speech. I mean, they talk about censorship. CMAX message is out there. They have their own website. They've got images of the bus ads on their website. Not on Metro buses they don't, right? Well, but they have alternate fora available to them, and they can get their message out. Their message is not censored by the county. We're not able to take those websites down, nor do we want to. Can you think of any case law that supports that proposition where somebody, like the Ku Klux Klan, or somebody, a controversial group wanted to march, and a court got away, or a public entity, rather, got away with saying, well, you can't march here, but you can march down that back alley where no one's looking. You can take out an ad in the newspaper where that entity gets to choose the forum? Well, I can't, but those are sort of 1960s, 1970s-type technologies. That's the Chief's point. But we're here today, and we have those other fora out there where the speech can get out through the Internet, through Twitter, through YouTube. And so looking back at decisions in the 60s where access to fora was controlled by newspapers or publishers or maybe even the side of a bus, it just doesn't fit with what we have today, and therefore the court doesn't have to rule that way. How do you deal with Skokie? I'm sorry? Skokie. You know Skokie? Yes. Well, that is a traditional public forum, and it's a different situation than making people get on a bus with a message that they're uncomfortable with, turning writers into human billboards, making them not want to ride the bus, and interfering with their rights. You know, we have one of those things, one of those sort of fundamental rules of society and the First Amendment is if you don't like a message, you don't have to read it. If you don't like an idea, you don't have to accept it. You can avert your eyes. There's nothing that requires you to sit there and dwell on it. Why isn't that what the applicable rule should be? People don't have... Just look the other way. There are plenty of other places to look. People on buses don't necessarily have that choice. Many people take the bus because that's their only mode of transportation that is available to them. They don't allow iPads on buses in Seattle? They're sitting on the bus. They don't allow newspapers? Are newspapers prohibited? Books prohibited? Is chatting with the person next to you prohibited in Seattle buses? Certainly not. You have to sit there and stare at the ads? But it's not just about being subjected to the message. It's about being associated with the message. The message is on the exterior of the bus. You're sitting right there. The bus ad is right underneath you as you're sitting right there where people may be throwing rocks or demonstrating, doing something else. You may dislike the message. You may be uncomfortable with the message. You may have no opinion about it. You're on the bus for a totally different reason. So people will think, gee, I'm riding in a bus that has this message, so people looking at me will say, that must be his message because he's riding in a bus with that message. Yes. Do you think a lot of people really think that? Well, I think the identity of the speaker is blurred in that case. You think that people, when they've got those Avogadro ads on them, you know, cheap lawyer, you think people think, oh, you know, the guys, the people riding the bus are endorsing this cheap lawyer? Well, certainly in DiLoretto, this court pointed out that it's a reasonable thing to be concerned about, whether a government or other people may be viewed as endorsing certain kinds of speech. I take your point. If we get that far, if we decide this is a designated public forum and apply strict scrutiny and go down that path, I can envision, for example, this is getting ahead of ourselves, I can envision one reasonable time, place, manner restriction might be that Metro decides to put the ad on every other bus so that if a passenger wants to get on the bus without that sign, he can and still use public transportation to get to work. But if somebody else is offended or frightened, you know, they wouldn't have to. But all of that is getting ahead of ourselves because the trial court didn't do that, right? There was no analysis. It was just this determination that it's a limited public forum, right? So none of that happened yet. We don't know about that. That is correct, but we believe it's the correct conclusion based on the facts in this case. Right. So I understand that, but is it your position that there is no way this could have been narrowly tailored, that it had to be an all-or-nothing approach? I think if we ñ I need to think about that a little more, but I think if we look at the reality of running these buses, I think trying to stagger it like that would be very difficult and not very feasible because people who come to the bus stop, they're not necessarily planning ahead to think about, they may not even be aware of the controversy. They want to get on the next bus to get to the doctor's appointment. Right, and there's no findings. I'm not presupposing what the reasonable time, place, manner, limitation would be. My question is, is it your position that this was all-or-nothing? The speech had to be completely curtailed. The ad had to be rejected. Under the context presented here, yes. Okay. Thank you. Thank you. You had half a minute. We'll double your time. You've got four minutes. Generosity is my middle name. I'd just like to make one brief point. Assuming that CMAQ is wrong about everything and that King County, this was a limited public forum, King County could take into account listener reaction and at some point the threat of disruption from people who objected to the message could justify the exclusion of speech. There was still a core factual dispute in this case about the level of disruption. And the key points on this are that King County wants to rely on these photographs and some sort of large-scale threat, but there was more than enough evidence in the record for a reasonable jury to conclude that King County itself did not view this as a large-scale threat. Sheriff Rahr, whose recommendation King County relied on, said she was concerned about local people overreacting. King County at summary judgment expressly disclaimed the issue and said there was no credible terrorist threat that supported its decision or it wasn't based on any kind of threat. The Joint Terrorism Task Force declined to provide an assessment or a strategic assessment. And Marlon Hoyle, this is at ER 102, said he looked at everything and his opinion was that none of this rose to the level of terrorist activity. So even assuming at some point the threat of disruption would work, the district court should have looked at what type of disruption was reasonable or credible and how this compared with previous disruption. Can I ask you just one question, Chief, if I may? Aren't we supposed to grant some level of deference or respect to the judgment of county officials in this context, or do you view even granting even a minimum amount of deference inconsistent with the First Amendment? Our position is that they're not entitled to deference, and they're not entitled to change the standard of disruption. I think White v. City of Norwalk and Norris both get into the fact that they're not entitled to say, our reasonable forecast of disruption, to the extent it's reacting to the message, is what they should focus on, and the court shouldn't have deferred. But even if it deferred to some extent, there was still conflicting evidence and the court should have drawn inferences in favor of CMAQ as the nonmoving party. Similarly, as with respect to the threat of disruption from the public, which I would say there's not even a dispute that it was some sort of localized threat at best or threats from some far-flung Internet hecklers who couldn't have even came to King County to do anything, the threat from driver disruption was similarly equivocal. And the key point on this is that Paul Bactell, the person who raised the issue of driver concerns, was taken to task in a blog post for letting his own political motivations Now we're relying on blog posts. I think we've reached the end of this argument. We get the point. You are well into your time. The case, as argued, will stand submitted. We thank counsel.
judges: Kozinski, Christen, Watford, Cjj